## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

BENJAMIN HUGHES, )
)
Plaintiff, )
)
v. )   Docket No. 2:22-cv-00098-NT
)
THE LINCOLN NATIONAL LIFE )
INSURANCE COMPANY, )
)
Defendant. )

## ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE
## ADMINISTRATIVE RECORD

Before me are the parties' cross-motions for judgment on the administrative record. For the reasons stated below, the Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 25) is **DENIED**. The Defendant's Motion for Judgment on the Administrative Record (ECF No. 26) is **GRANTED**.

## ADMINISTRATIVE RECORD[1]

### I.    The Plaintiff

The Plaintiff, Benjamin Hughes ("**Hughes**" or the "**Plaintiff**"), is a 43-year-old man who resides in Biddeford, Maine. *See* Administrative R., at LIN000688, LIN000694. Prior to the onset of health issues that form the basis of this action,

---

[1]    The following facts are drawn from the administrative record provided by the parties. *See* Administrative R. (ECF No. 14). The administrative record was uploaded to the Electronic Filing System ("**ECF**") in four parts, though the record is numbered continuously using a "Bates numbering" system. Part 1 (ECF No. 14-1) spans pages LIN000001—LIN000601; Part 2 (ECF No. 14-2) spans pages LIN000602—LIN001159; Part 3 (ECF No. 14-3) spans pages LIN001160—LIN001797; and Part 4 (ECF No. 14-4) spans pages LIN001798—LIN002497. For simplicity's sake, and following the lead of the parties, citations in this Order will refer to the Bates number(s) of the page(s) cited and will omit reference to the particular Part(s) in which the cited page(s) are located on ECF.

Hughes worked as a Principal Systems Engineer for Liberty Mutual Insurance Company, which was subsequently purchased by the Defendant, Lincoln National Life Insurance Company ("**Lincoln**" or the "**Defendant**"). *See* Administrative R., at LIN001173, LIN001363. The Principal Systems Engineer position is a sedentary role that entails mostly online work. *See* Administrative R., at LIN000699. During the Covid-19 pandemic, the job became mostly remote. Administrative R., at LIN000699. Hughes estimates that he generally worked from 6:00 a.m. to 6:00 p.m. each workday, though he was "on-call 24/7 for anything that would come up." Administrative R., at LIN000699.

## II.   The Policy

The Plaintiff was enrolled in the Defendant's group welfare benefit plan, which includes a group disability policy (the "**Policy**"). Administrative R., at LIN002461–LIN002497. Under the Policy, "Disabled" means that as of the last date worked and continuously through the completion of a 180-day Elimination Period, the claimant is "unable to perform the Material and Substantial Duties of his Own Occupation" as a result of "Injury or Sickness." *See* Administrative R., at LIN002467 (defining "Disabled"), LIN002468 (defining "Elimination Period"), LIN002464 (Schedule of Benefits defining "Elimination Period").

"Material and Substantial Duties" are defined as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." Administrative R., at LIN002469. The Policy defines "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began.

2

For the purposes of determining Disability under this policy, Lincoln will consider the Covered Person's occupation as it is normally performed in the national economy." Administrative R., at LIN002469.

Lincoln will pay claims under the Policy when it "receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician" Administrative R., at LIN002477. The Policy requires proof of: "1. Disability; 2. Regular Attendance of a Physician; and 3. Appropriate Available Treatment." Administrative R., at LIN002477. "The Proof must be given upon Lincoln's request and at the Covered Person's expense." Administrative R., at 2477. The Policy states that a claimant has the burden of providing proof of his disability throughout the duration of the disability benefit period; if the claimant fails to provide proof of continued disability, his monthly benefits will be discontinued. *See* Administrative R., at LIN002483.

### III.   The Plaintiff's Health Problems

On January 8, 2021, the Plaintiff visited a gastroenterologist, Dr. Mark Branda, reporting diarrhea, abdominal pain, and cramping. Administrative R., at LIN001214. The Plaintiff told Dr. Branda that, "for many years[,] he has had episodes of loose stools, urgency and abdominal pain and cramping in the morning," and that "[h]e often wakes up at 3–4 a.m. [w]ith gas and pain, [and] . . . then has stools which eventually resolve[] his discomfort." Administrative R., at LIN001215. Dr. Branda ordered laboratory testing, recommended that the Plaintiff take a fiber supplement, Metamucil, and gave the patient dicyclomine, a medication used to treat intestinal problems. Administrative R., at LIN001214. He noted that "[d]epending on results

3

and clinical course, colonoscopy . . . could be considered." Administrative R., at LIN001214.

A little over two weeks later, on January 25, 2021, the Plaintiff had a telehealth visit with Dr. Branda's nurse practitioner, Jamie Hare. Administrative R., at LIN001217. Hughes told Hare that he "[c]ontinues to have pain[,] gas[,] and bloating in the morning" and "[s]till some diarrhea," which was accompanied by "bouts of nausea" requiring the use of an anti-nausea medication, Zofran. Administrative R., at LIN001218. Hughes reiterated that "he starts to feel better later in the day after he has emptied his bowels." Administrative R., at LIN001218. Hughes told Hare that he had experienced a "partial benefit with dicyclomine and Metamucil" but that, "[at] this point[,] this disrupted bowel pattern is having a significant impact on his daily activities and is starting to affect his work schedule." Administrative R., at LIN001217. Hare ordered an endoscopy in addition to a colonoscopy. Administrative R., at LIN001217–LIN001218.

## IV. Short-Term Disability

The Plaintiff stopped working on February 26, 2021 and applied for short-term disability benefits on March 8, 2021. Administrative R., at LIN002442, LIN002459. In an email to a Lincoln claims examiner, Hughes stated that he was experiencing the following symptoms, which were preventing him from performing his job duties:

> urgent change in bowel movement; Diarrhea; nausea and vomiting lasting periods of time each morning; severe abdominal pain interfering with my ability to even focus on anything else; Inability to sleep due to pain; debilitating "flare ups" that prevent daily functions, even my ability to stand up; Intense Anxiety caused by symptoms, unknown diagnosis, delay of medical care, and impact on my ability to function at work.

4

Administrative R., at LIN002442. In evaluating Hughes' claim, Lincoln requested medical records from Dr. Branda and asked his office to complete a Restrictions Form. Administrative R., at LIN002422. Hare completed the Restrictions Form on Dr. Branda's behalf, and wrote: "Patient has developed chronic diarrhea, waxing + waning abd[ominal] pain[,] and intermittent nausea and vomiting. This results in inability to perform daily tasks and creates unpredictability to work. Needs to have endoscopic evaluation, however delayed due to Covid." Administrative R., at LIN002355. Hare added that Hughes could return to work on May 31, 2021, though he could "tentatively . . . return sooner pending vaccine status." Administrative R., at LIN002355.

On April 9, 2021, Lincoln approved short-term disability benefits for Hughes through April 25, 2021. Administrative R., at LIN002346. Hughes wrote back to Lincoln requesting to extend his benefits "through the beginning of June at the earliest" and told the claims examiner that Hare could provide more documentation if needed. Administrative R., at LIN002341. On April 14, 2021, Hare faxed Lincoln a letter "advis[ing] that Mr. Hughes is scheduled for endoscopic evaluation on 5/28/2021 and will be seen on 6/7/2021 for follow-up and re-evaluation in the office. He will be unable to work until that date and we will make further determination about return to work at that time." Administrative R., at LIN001349. On April 26, 2021, Hare submitted a letter on Hughes' behalf, which stated:

> As outlined in the 3/23/2021 restrictions form submitted to Lincoln Financial, Mr. Hughes has been experiencing chronic diarrhea, waxing and waning abdominal pain as well as bouts of nausea and vomiting

5

> resulting in missed time from work.[ ] These have resulted in an inability to maintain a consistent work schedule[ ] due to the unpredictable and frequent nature of his symptoms and therefore [he] has been out of work until he can complete[ ] his endoscopic evaluation. This was delayed [due] to the COVID pandemic. He will undergo evaluation on 5/28/2021 and will have an in office follow-up on 6/7/2021.

Administrative R., at LIN000357. On May 6, 2021, Lincoln approved the Plaintiff's short-term disability claim through June 20, 2021. Administrative R., at LIN001088.

On May 28, 2021, Hughes underwent an endoscopy and a colonoscopy. Administrative R., at LIN001484, LIN001486. Dr. Branda reviewed the results of the endoscopy and opined that there was "[m]ild erythematous gastropathy" but that it was an "[o]therwise normal exam." Administrative R., at LIN000420. As to the colonoscopy results, Dr. Branda commented that there were "[s]mall internal hemorrhoids" and "[m]ultiple diverticula . . . in the sigmoid colon." Administrative R., at LIN000422. Dr. Branda noted a few areas that required biopsies, Administrative R., at LIN000422, but later medical records note that the resulting "[l]aboratory testing was unremarkable." Administrative R., at LIN000060.

On July 30, 2021, Lincoln sent the Plaintiff a letter explaining that it closed the Plaintiff's claim because it "had not received the necessary documentation to extend ongoing benefits beyond June 20, 2021." Administrative R., at LIN001558. On August 5, 2021, the Plaintiff sent in the requested documentation. *See* Administrative R., at LIN001373–LIN001382, LIN001412. In a form submitted that day, Hughes reported that he could only sit or stand for less than an hour at a time, and that he could walk for twenty minutes at a time. Administrative R., at LIN001373. He stated that he could drive for "2 hrs with breaks" and that he took a two-to-three hour nap

every afternoon. Administrative R., at LIN001373. Hughes wrote that he was able to pursue his hobbies on only a "limited" basis, as his "hobbies are outdoors and often no access to facilities." Administrative R., at LIN001375. He also stated that his "limited" exercise was to "walk when able." Administrative R., at LIN001375. When asked if he had "returned to any type of employment of activity that provide[d him] money," the Plaintiff responded that he had not, noting below that he was a "[m]ember of LLC" that provided "[n]o income." Administrative R., at LIN001378. On August 5, 2021, after receiving Hughes' documentation, Lincoln extended Hughes' short-term disability benefits through August 29, 2021. Administrative R., at LIN001084.

## V.    Initial Denial of Long-Term Disability

On August 6, 2021, as the Plaintiff's short-term disability period was coming to an end, Lincoln notified the Plaintiff that his Long-Term Disability ("**LTD**") Claim was under review and that it had "referred [his] file for a medical review and assessment by a Board Certified Physician." Administrative R., at LIN001252. Three days later, on August 9, 2021, Lincoln requested an independent medical review from MLS National Medical Evaluation Services, an independent medical review company. Administrative R., at LIN000021. MLS then referred the Plaintiff's file to Dr. Brian Dooreck,[2] who completed a report on August 17, 2021. Administrative R., at LIN001200—LIN001203.

---

[2]    The Plaintiff states that Dr. Dooreck "is an internal medicine doctor, not a gastroenterologist." Pl.'s Mot. for J. on the Administrative R. 9 (ECF No. 25). But the Plaintiff does not provide a citation for this assertion, and in his report to Lincoln, Dr. Dooreck identified himself as "Board Certified: American Board of Internal Medicine, Gastroenterology." Administrative R., at LIN001203.

In his report, Dr. Dooreck summarized the Plaintiff's symptoms and colonoscopy results:

> The claimant is noted with irritable bowel syndrome with diarrhea associated with intermittent nausea and vomiting and wax and wean [sic] abdominal pain, cramping and bloating. Symptoms were reported since 12/2020. The claimant is also noted with a history gastroesophageal reflux disease. Colonoscopy on 5/28/2021 noted gastritis, hemorrhoids, diverticulosis with no colitis

Administrative R., at LIN001202. "Taking into consideration the entire clinical picture," Dr. Dooreck agreed that "there is a supported level of impairment that translates into restrictions and limitations from 3/1/2021 to present and ongoing." Administrative R., at LIN001202. Dr. Dooreck, however, disagreed with the Plaintiff's assertion that he was unable to work. "While the claimant's condition is unpredictable," Dr. Dooreck wrote, "it does not preclude the claimant from working. The claimant's symptoms are intermittent and as such the following restrictions and limitations would include having access to medical appointments, unrestricted bathroom privileges with full access, and medications as needed and deemed medically necessary and appropriate." Administrative R., at LIN001202.

On August 18, 2021, the Lincoln claims specialist assigned to Hughes' long-term disability claim sent Dr. Dooreck's report to Hare for her review and comment. Administrative R., at LIN001149. Six days later, on August 24, Hare responded that she "agee[d] with [Dr. Dooreck's] overall assessment of symptoms and disruption in daily activities," but disagreed with Dr. Dooreck's conclusion that Hughes could return to work. Administrative R., at LIN001149. Hughes, Hare wrote, "still experiences prolonged periods of disruption, days a time." Administrative R., at

LIN001149. "Given the nature of [Hughes'] work," which "require[d] prolonged periods of time on [the] phone," Hare recommended that Hughes be granted "an additional 4 weeks of restriction/out of work to continue work-up and therapy adjustments." Administrative R., at LIN001149. Lincoln forwarded Hare's comments to Dr. Dooreck, who, in turn, completed an addendum stating that his "[r]eview of [Hare's comments] does not alter the prior assessment. There is no new objective evidence to validate a change in determination." Administrative R., at LIN001139.

Lincoln also requested a confidential investigative report into the Plaintiff's activities from Convent Bridge, an independent full-service investigations company. Administrative R., at LIN000020. Convent Bridge scoured Hughes' social media accounts and found a photograph of him in knee-deep snow next to a shovel, posted on February 6, 2021, and an accompanying comment posted by Hughes saying that it was a "staged photo" and that he hadn't done any of the shoveling himself. Administrative R., at LIN001172. Convent Bridge also found a photograph of Hughes fishing posted on July 16, 2021, and a photograph of him kayaking posted on August 8, 2021. Administrative R., at LIN001169–LIN001170. Convent Bridge also found that Hughes was involved in a newly incorporated business called Virtually Onsite, a property caretaking service. Administrative R., at LIN001181.

Finally, Lincoln commissioned an Occupational Analysis of the Plaintiff's claim by Nicole Hall, a Vocational Rehabilitation Counselor. Administrative R., at LIN001141–LIN001142. Hall reviewed Hughes' medical records, Dr. Dooreck's report, and other sources pertinent to evaluating Hughes' occupational demands. *See*

Administrative R., at LIN001141. Hall concluded that Hughes' occupation as a

Principal System Engineer

> would allow one the opportunity to sustain comfort and autonomy in the
> work setting with the ability to utilize the bathroom facilities as needed
> as well as take medications as needed. The ability to attend medical
> appointments may require a level of accommodation or agreement
> between the employer and employee should such appointments require
> time away from or off of work.

Administrative R., at LIN001142.

By letter dated August 31, 2021, Lincoln notified Hughes that it had

"determined you do not meet the definition of disability for your own occupation" and

thus no LTD benefits were payable. Administrative R., at LIN001112.

## VI.    The Appeal

The Plaintiff, through his attorney, Andrew Davis, appealed Lincoln's

determination. *See* Administrative R., at LIN001056. Attorney Davis attempted to

send the appeal and accompanying documents on November 23, 2021, but Lincoln did

not receive the appeal until December 8, 2021. Administrative R., at LIN000388,

LIN001056.

In connection with the appeal, Hughes submitted medical records from Dr.

Branda's office as well as a Vocational Analysis. *See* Administrative R., at

LIN000390. The medical records showed that Hughes had undergone a "capsule

endoscopy" and "was found to have a large intraluminal windsock

deformity/diverticulum" for which "[f]urther work up and testing . . . is ongoing" and

which "may require surgery." Administrative R., at LIN000392. The medical records

submitted also showed, however, that at least a follow-up exam identified "no

intrinsic or extrinsic abnormality" and, "[i]n particular, a wind-sock deformity was not visualized." Administrative R., at LIN000799. The Plaintiff also provided the record of a November 8, 2021 visit with Hare, the notes for which show only that Hare gave the Plaintiff instructions regarding his medication and recommended he follow up in five weeks. *See* Administrative R., at LIN000785.

The Plaintiff also commissioned a vocational analysis by two consultants at Seacoast Rehabilitation—Charles Galarraga and Nicole Duchette. *See* Administrative R., at LIN000688–LIN000689. In conducting the vocational analysis, Galarraga and Duchette reviewed the Plaintiff's medical file and conducted a survey of employers "within a 50-mile geographical distribution of [Hughes'] address using the medically opined restrictions and limitations of the claimant's attending providers as well as the insurance company medical providers." Administrative R., at LIN000688. The survey included the following questions:

- If a potential applicant, due to bouts of chronic disease, waxing and waning abdominal pain including nausea, were to miss several days of work due to the unpredictable and frequent occurrence of these symptoms, would they be able to perform the materials [sic] and substantial duties of this occupation?

- Would someone be able to attend medical appointments that require time away from work greater than 2 or more days per month while performing the duties of this occupation?

Administrative R., at LIN000707. All employers surveyed answered these questions in the negative. *See* Administrative R., at LIN000688. The survey also asked employers, "Would someone always be able to utilize the bathroom facilities as needed while performing the duties of this occupation?" Administrative R., at LIN000707. Surveyed employers answered this question in the affirmative, though

some qualified their response by stating, for example, "Yes, so long as it does not take one off tasks and pace." Administrative R., at LIN000708–LIN000716. Galarraga and Duchette also conducted an occupational analysis based on the duties associated with Hughes' job and opined that:

> a claimant such as Mr. Hughes who would be facing unpredictable symptomology and medical scheduling would regularly be unable to spend most of his time with conflict resolution, communicating with others, and directing, controlling, or planning activities of others which are time sensitive and/or immediate tasks, and could be unavailable if a decision needed to be made by him.

Administrative R., at LIN000689. Overall, the Galarraga/Duchette analysis concluded that "the claimant cannot perform the material and substantial duties of his OWN Occupation." Administrative R., at LIN000688.

On December 14, 2021, Lincoln requested a review of Hughes' medical records from Exam Coordinators Network ("**ECN**"), a different outside medical vendor than the one used during the initial claim; ECN referred the Plaintiff's file to Dr. Ravi Ravinuthala, who identified himself as being "Board Certified [in] Gastroenterology." Administrative R., at LIN000017–LIN000018, LIN000215. Dr. Ravinuthala submitted his report on December 30, 2021. Administrative R., at LIN000211. When asked to "describe how any supported level of impairment translates into restrictions and limitations," Dr. Ravinuthala responded that Hughes' "[c]linical condition is best described by irritable bowel syndrome" and that, "[a]s the claimant has residual diarrhea attributed to the diagnosis, it is reasonable to support a degree of restrictions." Administrative R., at LIN000214. "However," Dr. Ravinuthala continued, "there is no evidence of any measurable examination abnormality and/or

diagnostic finding that would translate into the need for physical restrictions or limitations. Additionally, surveillance footage indicates the claimant has been capable of performing activities including shoveling snow, wadding [sic] in a lake, and fishing on a boat." Administrative R., at LIN000214. Dr. Ravinuthala added that, "The claimant would require access to a bathroom on a [sic] as needed basis based on his symptoms of irritable bowel syndrome due to urgency and control of bowels. The claimant would still be able to maintain full-time work capacity with bathroom breaks being only as needed for IBS symptoms. Otherwise, the claimant has no restrictions or limitations." Administrative R., at LIN000214.

On December 28, 2021, the Plaintiff submitted additional medical records to be included in the appeal review. Administrative R., at LIN000220. Lincoln forwarded those additional records to Dr. Ravinuthala on January 3, 2022, and requested an addendum. Administrative R., at 208. Dr. Ravinuthala returned the addendum on January 12, 2022. Administrative R., at LIN000203. In the addendum, Dr. Ravinuthala reiterated his initial conclusion that "[t]he claimant's impairing symptoms require access to a bathroom as needed for IBS symptoms," but "[t]here is no indication the claimant cannot sustain fulltime work activity." Administrative R., at LIN000205.

On January 13, 2022, 36 days after Lincoln received the appeal, Lincoln sent the Plaintiff Dr. Ravinuthala's report and addendum, along with a cover letter setting a deadline for the Plaintiff "to review and comment on new/additional evidence . . . before a decision is rendered on Mr. Hughes's appeal." Administrative R., at

LIN000191. The letter further explained that due to "special circumstances," Lincoln was taking a 45-day extension to decide the Plaintiff's appeal, and that its review process would be "tolled while Lincoln is awaiting receipt of requested documentation." Administrative R., at LIN000191–LIN000192.

The Plaintiff responded on February 1, 2022. *See* Administrative R., at LIN000077. In response to Dr. Ravinuthala's review, Attorney Davis addressed the investigative photos that showed the Plaintiff shoveling snow, fishing, and kayaking, which Dr. Ravinuthala had taken into account in his medical review. *See* Administrative R., at LIN000078. "Dr. Ravinuthala's assessment is not accurate," Attorney Davis wrote, because (1) Hughes merely posed with a shovel, but did not actually shovel snow; and (2) the photo of Hughes on a boat could have been a "pre-disability photo[ ]." Administrative R., at LIN000078.

The Plaintiff's response also included a letter from Hare, in which she wrote that she did not "feel that [Dr. Ravinuthala's medical review] adequately capture[d] the impact this condition [(IBS)] has on this patient's day-to-day activities and impact on work function." Administrative R., at LIN000080. Hare noted that IBS "is an understandably challenging diagnosis when it comes to disability because the majority of the diagnosis and impact on functional status is based on primarily subjective findings," but "this does not mean the condition is any less impactful than" other conditions diagnosable via objective findings. Administrative R., at LIN000081–LIN000082.

Finally, the Plaintiff's response included the results of a CT Scan dated December 29, 2021. *See* Administrative R., at LIN000083. The CT Scan found "[n]o acute abnormality of the abdomen or pelvis." Administrative R., at LIN000084.

On February 10, 2022, Dr. Ravinuthala completed a second addendum in response to the Plaintiff's additional information. *See* Administrative R., at LIN000064–LIN000065. Dr. Ravinuthala wrote that "the additional medical information does not alter the prior claim determination." Administrative R., at LIN000065.

On February 8, 2022, Attorney Davis submitted an "updated gastroenterology visit" note from Dr. Branda. Administrative R., at LIN000058. Dr. Branda's note reiterated Hughes' diagnosis of IBS, though he noted that Hughes' "symptoms are currently marginally well controlled on a combination of" different medications. Administrative R., at LIN000059. As to the "windsock" deformity, Dr. Branda noted that various tests had failed to show an abnormality, and wrote that "[i]t is unlikely that the abnormality seen in the duodenum is contributing to [Hughes'] current symptoms." Administrative R., at LIN000059.

Dr. Ravinuthala submitted a third addendum on February 18, 2022, reviewing the February 8 note from Dr. Branda. *See* Administrative R., at LIN000049. Dr. Ravinuthala concluded as follows:

> The additional medical information does not alter the prior claim determination. As of 02/08/2022, the claimant seemed to be stable on his current medication regimen. The information did not provide any indication that the claimant's gastric issues had been affecting his ability to function on a daily basis as it pertained to completing activities[,] daily living or work-related duties.

15

Administrative R., at LIN000050.

On March 3, 2022, at the request of Lincoln, Jason Miller, a Board-Certified Vocational Expert, submitted a vocational review of the prior occupational analyses completed by Hall and Galarraga/Duchette in light of the restrictions and limitations outlined by Dr. Ravinuthala. *See* Administrative R., at LIN000040. As to the Galarraga/Duchette analysis, Miller noted that "much of the information obtained by Mr. Galarraga and Ms. Duchette were a direct result of" leading questions that, for example, took as a given that the "potential applicant . . . [would] miss several days of work due to the unpredictable and frequent occurrence of [his] symptoms"—a restriction/limitation that was not prescribed in Dr. Ravinuthala's medical review. Administrative R., at LIN000041. Miller did find it notable that, in the Galarraga/Duchette analysis, "[a]ll employers answered in the affirmative" to the question of whether an employee would "always be able to utilize the bathroom facilities as needed while performing the duties of this occupation." Administrative R., at LIN000041. "This is important and the most crucial question asked," Miller explained, "because it is a direct comparison between the restriction posed by Dr. Ravinuthala and the response by the employers . . . and all employers responded that this is possible." Administrative R., at LIN000041.

## VII.   Lincoln's Decision on Appeal

On March 10, 2022, Lincoln upheld its determination that Hughes was "not eligible for LTD benefits." Administrative R., at LIN000035. In its decision, Lincoln quoted Miller's vocational review at length. *See* Administrative R., at LIN000032–

LIN000034. Lincoln then summarized the reasoning for its denial of Hughes' LTD benefits as follows:

> We acknowledge Mr. Hughes's claim of total impairment based on IBS. We also acknowledge the Vocational Reviews from Charles Galarraga, MS/Nicole Duchette, MS which state Mr. Hughes cannot perform the material and substantial duties of his Own Occupation. However, the diagnostic assessment to date has been essentially unremarkable. The ova and parasites stool testing was negative. The calprotectin Fecal by immunoassay was normal. The Helicobacter pylori screen was negative. CT scan of the abdomen and pelvis demonstrated no colonic abnormality. A colonoscopy and upper endoscopy noted hemorrhoids, diverticulosis, and reflux. The small bowel series demonstrated a normal gas pattern, soft tissue, and bony structures. There is no diagnostic abnormality to account for the claimant's continued symptoms. There were no abnormalities on physical examination. In addition, there is no evidence of excessive use of the bathroom, emergent treatment, or hospitalizations. The evaluation by Dr. Ravinuthala outlined restrictions and limitations of having access to a bathroom. As outlined in the occupational analysis, the occupation would allow Mr. Hughes the opportunity to sustain comfort and autonomy in the work setting with the ability to utilize the bathroom facilities as needed. Therefore, the restriction and limitation of having access to a bathroom would not prevent Mr. Hughes from performing his own occupation.
>
> The appeal review and analysis considered all the medical, vocational, and claim documentation contained in Mr. Hughes's LTD administrative record, whether or not specifically referenced in the document. Our role in reviewing the file is to determine whether Mr. Hughes's medical conditions and the medical documentation contained in the file validates impairment resulting in restrictions and limitations, which would preclude his from performing the duties of his Own Occupation as defined by the Policy. After a complete evaluation of his claim, including all information submitted with the appeal, all medical reviews completed on the file, and taking into consideration the opinions of his providers as set forth in their written record, we determined the clinical evidence does not support Mr. Hughes was precluded from performing his Own Occupation throughout and beyond the Policy's elimination period. As such, our review concludes Mr. Hughes is not eligible for LTD Benefits.

Administrative R., at LIN000034–LIN000035.

17

On April 15, 2022, the Plaintiff filed suit in this Court, seeking to recover disability benefits under the Policy pursuant to the Employee Retirement Income Security Act ("**ERISA**"), 29 U.S.C. § 1132(a)(1)(B). Compl. ¶ 7 (ECF No. 1).

## DISCUSSION

The parties each move for judgment on the administrative record. The Plaintiff makes two arguments in support of his motion. First, the Plaintiff argues that Lincoln deprived Hughes of a "full and fair review" as mandated by ERISA and its implementing regulation, and therefore that the case should be remanded to Lincoln for a full and fair review of Hughes' claim. *See* Pl.'s Mot. for J. on the Administrative R. ("**Pl.'s Mot.**") 18 (ECF No. 25). Second, alternatively, the Plaintiff asserts that I should review Lincoln's appeal determination de novo and find that Lincoln's denial of LTD benefits to Hughes was incorrect. *See* Pl.'s Mot. 18. Lincoln opposes the Plaintiff's motion and argues that it is entitled to judgment on the administrative record. *See* Def.'s Mot. for J. on the Administrative R. ("**Def.'s Mot.**") (ECF No. 26). Lincoln asserts that I should apply the deferential arbitrary and capricious standard of review and uphold Lincoln's denial of Hughes' LTD benefits. *See* Def.'s Mot. 3. Below I address each of these arguments.

## I.    Full and Fair Review

I turn first to the Plaintiff's contention that Lincoln deprived Hughes of a "full and fair review" as mandated by ERISA and its implementing regulation. *See* Pl.'s Mot. 18. "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Merit Constr. All. v.*

*City of Quincy*, 759 F.3d 122, 127–28 (1st Cir. 2014) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). "To accomplish this goal, section 503 of ERISA [("**Section 503**")] establishes minimum procedural requirements that govern how an ERISA plan processes claims for health and disability benefits." *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 26 (1st Cir. 2021) (citing 29 U.S.C. § 1133). Section 503 provides that "any participant whose claim for benefits has been denied" must be afforded a "full and fair review . . . of the decision denying the claim," in compliance "with regulations of the Secretary [of Labor]." 29 U.S.C. § 1133.

"In accordance with the authority of [S]ection[ ] 503," the Department of Labor promulgated a "claims procedure" regulation. 29 C.F.R. § 2560.503-1. Subsection (h) of the regulation ("**Subsection (h)**"), which governs the "[a]ppeal of adverse benefit determinations," requires that "[e]very employee benefit plan . . . establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination . . . , and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1). Subsection (h) further states that for a plan to satisfy the requirement of providing a "full and fair review of a claim and adverse benefit determination," the claimant must "be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."[3] *Id.* § 2560.503-1(h)(2)(iii). In addition,

---

[3]      "A document, record, or other information [is] considered 'relevant' to a claimant's claim if" it was "relied upon in making the benefit determination," or was "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8)(i)–(ii).

claimants must be provided "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits." *Id.* at § 2560.503-1(h)(2)(ii). These requirements of disclosure and opportunity for response are equally applicable at the administrative appeal stage as they are at the initial determination stage. *See Jette*, 18 F.4th at 29.

Here, the Plaintiff contends that Lincoln denied him a full and fair review because it failed to provide him with a copy of, or an opportunity to respond to, the vocational analysis developed by Miller, which was relevant to the Defendant's determination of the Plaintiff's appeal. Pl.'s Mot. 20. For its part, the Defendant does not seem to contest the fact that it failed to provide Miller's analysis to Hughes prior to denying his internal appeal.

As the Defendant points out, however, whether Lincoln failed to turn over relevant records is not the end of the full-and-fair-review analysis. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Administrative R. ("**Def.'s Opp'n**") 17 (ECF No. 32). Under First Circuit precedent, "even if the claimant shows that procedural irregularities have occurred in the course of a review, [the Court] typically require[s] [the claimant] to show prejudice as well." *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 82 (1st Cir. 2019) (quoting *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 (1st Cir. 2016)); *see also Warming v. Hartford Life & Accident Ins. Co.*, 663 F. Supp. 2d 10, 12 (D. Me. 2009) ("A plaintiff must make a showing of prejudicial procedural irregularity to warrant reversal [or remand] on the ground of denial of the right to full and fair

review."). To establish prejudice, "[a] claimant must show prejudice 'in a relevant sense' and [show] that correct notice 'would have made a difference.' " *Hatfield v. Blue Cross & Blue Shield of Mass., Inc.*, 162 F. Supp. 3d 24, 42 (D. Mass. 2016) (quoting *Recupero v. New Eng. Tel. & Tel. Co.*, 118 F.3d 820, 840 (1st Cir. 1997)). In other words, "a claimant must 'demonstrate a connection between' the plan administrator's procedural failure and '[the claimant's] inability to receive from the plan administrator a full and fair review of [his] claim to benefits.' " *Winters v. Liberty Life Assurance Co. of Bos.*, No. 20-11937-MLW, 2022 WL 6170588, at *8 (D. Mass. Oct. 7, 2022) (quoting *DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 16 (1st Cir. 2005)).

In this case, the Plaintiff asserts that Lincoln's procedural error in failing to provide Miller's review prejudiced Hughes because it "deprived [him] of the opportunity to further develop the administrative record that is now before this Court." Pl.'s Mot. 20. But the Plaintiff has not identified or submitted to this Court any evidence that he contends he would have provided to Lincoln to further develop the administrative record if given the opportunity to respond to Miller's analysis. The Plaintiff had the opportunity to submit such evidence if it existed—as the First Circuit has explained, "it may be appropriate for the court to consider 'evidence outside the administrative record' in assessing a claim of 'prejudicial procedural irregularity in the ERISA administrative review procedure.' " *DiGregorio*, 423 F.3d at 16 (quoting *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 520 (1st Cir. 2005)). And this Court's scheduling order, issued on June 15, 2022, explicitly provided the

parties an opportunity to "modify the Administrative Record and/or to conduct discovery." ERISA Scheduling Order 2 (ECF No. 9). The Plaintiff's failure to proffer any additional evidence he would have provided to Lincoln given the chance to respond to Miller's review seriously undercuts his argument that the procedural irregularity was prejudicial. *See Winters*, 2022 WL 6170588, at *9 (finding that the claimant had not made a showing of prejudice in part because he "has not identified or submitted to this court any evidence that he contends he would have provided to" the plan administrator to support his appeal had he had the opportunity to do so).

Additionally, the Plaintiff has not demonstrated a connection between Lincoln's failure to provide a copy of Miller's report and Hughes' inability to receive a full and fair review. The Plaintiff argues that he was denied the opportunity to discuss what he asserts are shortcomings in Miller's review—namely that Miller unfairly characterized the Galarraga/Duchette survey because he "ignored . . . the significant dialogue between employers and [the surveyors] that placed critical limitations on" what it meant to provide "needed access" to bathroom facilities while performing the duties of the occupation. Reply to Def.'s Resp. to Pl.'s Mot. for J. on the Administrative R. ("**Pl.'s Reply**") 3 (ECF No. 35). Specifically, the Plaintiff suggests that Miller failed to acknowledge that some employers surveyed by Galarraga and Duchette qualified their affirmative answers to the question of whether an employee would always be able to utilize bathroom facilities while performing the duties of their occupation, saying, for example, that the employee could utilize bathroom facilities but still "would need to be able to complete their job

duties sufficiently." Pl.'s Reply 3. As a result of this "misconception" about the Galarraga and Duchette survey, the Plaintiff asserts, "the parties are far from any agreement on the level of interruption caused by Mr. Hughes' condition." Pl.'s Reply 3–4.

The problem for the Plaintiff is that the portion of the Miller report quoted in the appeal denial explicitly acknowledges that some employers qualified their answers to the restroom access question: "All employers answered in the affirmative on this question. . . . While some indicated that [the employee] would need to remain on task [to perform the duties of this occupation], others simply said yes." Administrative R., at LIN000033. Thus, Lincoln already considered the point that the Plaintiff states that he would have made if he had the opportunity to comment on Miller's review. And, even after considering that point, Lincoln still concluded that the Plaintiff was not entitled to LTD benefits.

Moreover, while the Plaintiff may be correct that the parties disagree about the level of interruption caused by Hughes' medical condition, that disagreement does not stem from the Miller review. As explained in more detail below, the real sticking point for Lincoln was the lack of medical evidence showing that Hughes was disabled. For example, in its appeal decision, Lincoln acknowledged the central conclusion of the Galarraga/Duchette analysis—that Hughes "cannot perform the material and substantial duties of his Own Occupation." Administrative R., at LIN000034. Yet Lincoln ultimately did not give the Galarraga/Duchette findings much weight, not because of Miller's comments, but rather due to the lack of "clinical evidence" to

support Hughes' disability claim. Administrative R., at LIN000034. Even if Hughes had responded to what he viewed as Miller's mischaracterization of the Galarraga/Duchette analysis, that would not have ameliorated the lack of medical evidence supporting his claim for LTD benefits.

Overall, the Plaintiff has not shown he was prejudiced by Lincoln's failure to disclose Miller's review prior to rendering its appeal decision. The Plaintiff's request to remand the appeal decision is therefore denied.

## II.   Lincoln's Administrative Appeal Decision

I turn now to the parties' disagreement as to whether I should uphold Lincoln's decision to deny Hughes' appeal. This disagreement entails two, interrelated issues. The first issue is what standard of review to apply; the second issue is, applying the appropriate standard, whether Lincoln's appeal decision should be upheld. Below I address each of these issues.

### A.   Standard of Review

The parties disagree about how much deference I should afford to Lincoln's administrative appeal decision. In general, "[t]he standard of review for a claim brought [to recover benefits due under a plan] depends on the discretion afforded the administrator of the plan." *Quirk v. Vill. Car Co.*, 1:19-cv-00217-JCN, 2020 WL 908111, at *4 (D. Me. Feb. 25, 2020). "The default rule favors de novo review: a challenge to a denial of benefits is to be reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Stephanie C.*, 813 F.3d at 427.

24

"When, as in this case,[4] a plan administrator has discretion to determine an applicant's eligibility for and entitlement to benefits, the administrator's decision must be upheld unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 212–13 (1st Cir. 2004) (quoting *Vlass v. Raytheon Emps. Disability Tr.*, 244 F.3d 27, 29–30 (1st Cir. 2001)).

The Plaintiff asserts that, even if the Plan grants Lincoln discretionary decisionmaking authority, which normally would trigger arbitrary and capricious review, Lincoln lost its entitlement to judicial deference because it failed to strictly adhere to ERISA's claims procedure regulation by taking an unjustified and untimely extension.[5] *See* Pl.'s Mot. 21. Therefore, the Plaintiff argues, Lincoln's decision should

---

[4]     The Policy states that "Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." Administrative R., at LIN002491. To accord a plan administrator deferential judicial review, "a grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that unambiguously indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 428 (1st Cir. 2016). As the Plaintiff offers no argument to the contrary, I assume that the Policy affords Lincoln discretion to construe the terms of the Policy and determine whether benefits are due.

[5]     The Plaintiff cites a Second Circuit case, *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 819 F.3d 42 (2d Cir. 2016), for the contention that a procedural violation of this type warrants de novo review. *See* Pl.'s Mot. for J. on the Administrative R. 18 (ECF No. 25). In *Halo*, the Second Circuit held that "a plan's failure to establish or follow the claims-procedure regulation entitles the claimant to have his or her claim reviewed *de novo* in federal court." *Halo*, 819 F.3d at 53. It appears that the First Circuit has never directly addressed *Halo* nor determined whether a plan administrator's failure to strictly adhere to ERISA's claims procedure regulation automatically triggers de novo review. I need not address these issues here because I find that Lincoln did not commit a procedural violation in taking the extension.

The Plaintiff does not raise the possibility that Lincoln's failure to provide Miller's analysis— a procedural irregularity—triggers de novo review. I note, however, that caselaw suggests that this type of procedural irregularity, absent a showing of prejudice, would not entitle a claimant to de novo review. *See, e.g.*, *Winters v. Liberty Life Assurance Co. of Bos.*, No. 20-11937-MLW, 2022 WL 6170588, at *10 (D. Mass. Oct. 7, 2022) ("[The claimant's] failure to prove prejudice is fatal to [his] contention that Liberty's failure to provide him all the information it received entitles him to de novo review of its decision to deny his claim for benefits."). Indeed, *Halo* itself states that de novo review is not triggered, despite a procedural irregularity, if the plan "can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent and harmless." *Halo*, 819 F.3d at

25

be reviewed de novo. *See* Pl.'s Mot. 23. The Defendant, on the other hand, argues that Lincoln *did* strictly follow the claims-procedure regulation and therefore its decision is still entitled to deferential review. *See* Def.'s Mot. 6–7.

Under the ERISA claims-procedure regulation, a plan administrator has 45 days to issue a benefit determination appeal decision. 29 C.F.R. § 2560.503-1(i)(1)(i), (i)(3)(i). The 45-day clock to decide an appeal starts "at the time an appeal is filed," 29 C.F.R. § 2560.503-1(i)(4), though the regulation clarifies that "*receipt* of the claimant's request for review" is what starts the clock. 29 C.F.R. § 2560.503-1(i)(1)(i) (emphasis added). A plan administrator may take one 45-day extension during the course of reviewing a claimant's appeal if the "administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim." 29 C.F.R. § 2560.503-1(i)(1)(i), (i)(3)(i). To obtain the extension, the plan administrator must provide the claimant with written notice of the extension prior to the termination of the initial 45-day period, and the notice must "indicate the special circumstances requiring an extension of time." 29 C.F.R. § 2560.503-1(i)(1)(i).

In this case, the Plaintiff asserts that Lincoln committed a procedural violation because it (1) failed to request an extension within 45 days after receipt of Hughes' appeal, and (2) did not establish the "special circumstances" necessary to take a 45-day extension. Pl.'s Mot. 21–23. The Defendant retorts that (1) Lincoln did in fact

---

46. Here, as explained above, Lincoln's failure to provide Hughes with the Miller analysis was not prejudicial and thus does not entitle Hughes to de novo review.

request an extension within 45 days after receipt of Hughes' appeal, and (2) the extension request was justified by "special circumstances." *See* Def.'s Mot. 6; Def.'s Opp'n 12.

The facts here support the Defendant's version of events. First, as to whether Lincoln requested an extension within the 45-day time limit, the Plaintiff's argument relies on the incorrect assertion that the 45-day clock started ticking on November 23, 2021. *See* Pl.'s Mot. 22. In fact, it seems that the Plaintiff did *attempt* to fax notice of his appeal to Lincoln on November 23, 2021, but Lincoln, apparently through no fault of its own,[6] did not actually *receive* the appeal documents until December 8, 2021. *See* Administrative R., at LIN001058 (time stamp at top of page dated 12/8/2021), LIN000388 (explaining that Attorney Davis was "resending the appeal . . . today December 8, 2021"), LIN001056 (December 8, 2021 fax transmission sent on behalf of Attorney Davis acknowledging that the appeal was resent because Lincoln "had not yet received the info" faxed on November 23, 2021). Contrary to what the Plaintiff asserts, then, Lincoln's 45-day processing time began running on December 8, when it received Hughes' appeal, not November 23, when Hughes initially attempted to send the appeal. *See* 29 C.F.R. § 2560.503-1(i)(1)(i) (stating that "receipt of the claimant's request for review" is what starts the appeal-processing clock). Lincoln then sent notice of the 45-day extension on January 13, 2022—36 days after

---

[6]     The Defendant raises the possibility that the November 23, 2021 fax was sent to the wrong number, which explains why Lincoln did not receive the Plaintiff's appeal notice until it was resent to a different number on December 8, 2021. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Administrative R. 12 (ECF No. 32). This theory certainly seems plausible and it is supported by the record. The Plaintiff does not respond to the Defendant's assertion, nor does he offer an alternative explanation for why Lincoln did not receive the appeal until two weeks after it was originally sent.

it received Hughes' appeal, and well within the 45-day window in which Lincoln was permitted to file notice of an extension. *See* Administrative R., at LIN000191.

Having found that Lincoln's notice of an extension was timely, I turn to the question of whether Lincoln's extension was justified by a "special circumstance." The ERISA claims-procedure regulation does not precisely define "special circumstance," nor does it seem that the First Circuit has addressed the meaning of the term. The Department of Labor has offered some clarification, explaining that "the time periods for decisionmaking are generally maximum periods, not automatic entitlements." ERISA Rules and Regulations for Administration and Enforcement; Claims Procedures, 65 Fed. Reg. 70,246, 70,250 (Nov. 21, 2000). According to the Department, "it may be unreasonable" to seek an extension if the "claim presents no difficulty whatsoever," and "an extension may be imposed only for reasons beyond the control of the plan." *Id.* Some courts have held, for example, that a plan's need to obtain a medical records review does not qualify as a special circumstance because "[i]n most, if not all, long term disability appeals, the insurer obtains a file review by a medical consultant." *Satter v. Aetna Life Ins. Co.*, No. 3:16-cv-1342 (AWT), 2019 WL 2896410, at *6 (D. Conn. Mar. 20, 2019). Therefore, "[t]o find that the [need to obtain an independent medical review] constituted a 'special circumstance' would mean that virtually any request for an extension would be permissible, an outcome the Department of Labor has expressly rejected." *Id.* (quoting *Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 450 (S.D.N.Y. 2017)); *see also Fredrich v. Lincoln Life & Annuity Co. of N.Y.*, 603 F. Supp. 3d 38, 47 (E.D.N.Y. 2022) (finding that

28

"Lincoln's need to seek yet another medical opinion . . . does not suffice" as a special circumstance).

Here, the Plaintiff asserts that Lincoln did not have a "special circumstance," but I am not convinced. After the Defendant received the Plaintiff's appeal on December 8, 2021, it promptly commissioned an independent medical review from a second gastroenterologist, Dr. Ravinuthala. But after the record was sent to Dr. Ravinuthala, the Plaintiff submitted additional medical records on December 28, 2021. Administrative R., at LIN000220. Dr. Ravinuthala issued his initial report on December 30, 2021. On January 3, 2022, Lincoln asked Dr. Ravinuthala to consider the Plaintiff's additional medical information to determine whether it changed Dr. Ravinuthala's opinion. Administrative R., at LIN000208. And Dr. Ravinuthala submitted an addendum to his report on January 12, 2022. Administrative R., at LIN000203. Lincoln sent Dr. Ravinuthala's report and addendum to the Plaintiff the next day, on January 13, but at that point only ten days remained in the initial 45-day period, which Lincoln perceived to be too little time to allow the Plaintiff to respond and then to complete the appeal process. Administrative R., at LIN000191.

The Plaintiff contends that Lincoln's claimed special circumstance was its "need to complete a medical review," Pl.'s Mot. 22, but the record shows that Lincoln took the 45-day extension in order to consider Hughes' additional evidence and to "provide [Hughes] with an opportunity to review and comment on new/additional evidence that has been received before a decision is rendered on Mr. Hughes's appeal." Administrative R., at LIN000191. Further, the record shows that Lincoln

acted promptly and efficiently in seeking the addendum. In other words, the record indicates that Lincoln needed an extension not because it had failed to promptly commission an initial medical records review, but rather because it had received additional materials from the Plaintiff and therefore, "due to matters beyond control of the plan," 29 C.F.R. § 2560.503-1(f)(3), lost time that would have allowed Hughes adequate time to respond. *Cf.* 29 C.F.R. § 2560.503-1(h)(4)(ii) (explaining that "new or additional rationale" must be provided "sufficiently in advance . . . to give the claimant a reasonable opportunity to respond"). This was a special circumstance and one that benefitted Hughes. Lincoln did not commit a procedural violation and its appeal determination is thus entitled to deferential arbitrary and capricious review.

### B.  Reasonableness of Lincoln's Decision

The final question is whether Lincoln's appeal decision survives arbitrary and capricious review. "Under that standard, the decision 'must be upheld if there is any reasonable basis for it.'" *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 698 (1st Cir. 2007) (quoting *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 64 (1st Cir.2005)). "Stated in different terms, [the Court] will uphold an administrator's decision 'if the decision was reasoned and supported by substantial evidence,' meaning that the evidence 'is reasonably sufficient to support a conclusion and contrary evidence does not make the decision unreasonable.'" *Id.* (quoting *Denmark v. Liberty Life Assurance Co. of Bos.*, 481 F.3d 16, 33 (1st Cir. 2007)). "The fact that the record reflects contradictory evidence does not by itself mean the administrator's decision is not supported by substantial evidence." *Carter v. Aetna Life Ins. Co.*, No. 2:17-cv-00398-JAW, 2019 WL 80434, at *13 (D. Me. Jan. 2, 2019). And "a plan administrator's

discretionary decision is not unreasonable merely because a different, reasonable interpretation could have been made." *Ferry v. Prudential Ins. Co. of Am.*, No. 2:10-cv-211-GZS, 2011 WL 4828816, at *17 (D. Me. Oct. 10, 2011).

Under any standard of review, "[a] person claiming ERISA benefits bears the burden of proving [his] entitlement to those benefits."[7] *Id.* at *10. And, "[u]nlike typical motions for summary judgment, the court deciding a motion for judgment on the administrative record under the arbitrary and capricious standard does not draw inferences in favor of the nonmoving party. Instead, doubts are typically resolved in favor of the plan administrator." *Winters*, 2022 WL 6170588, at *11 (citations omitted).

Here, the Plaintiff bore the burden of providing "Proof of continued Disability." Administrative R., at LIN002483. This required the Plaintiff to show (1) that he had an "Injury or Sickness," and (2) that the injury or sickness rendered him "unable to perform the Material and Substantial Duties of his Own Occupation" as it is "normally performed in the national economy." Administrative R., at LIN002467, LIN002469. The Plaintiff argues that he met his burden and that "[t]he Administrative Record is replete [with] testing confirming irregularities concerning Mr. Hughes['] gastrointestinal systems." Opp'n to Def.'s Mot. for J. on the Administrative R. 9 (ECF No. 31).

---

[7]       The allocation of the burden of proof on the claimant is consistent with the language of the Policy, which states that the claimant must "provide Proof of continued disability." Administrative R., at LIN002483.

The issue for the Plaintiff is that simply showing gastrointestinal "irregularities" was not enough; the Plaintiff also had to prove that those irregularities made him unable to perform the material and substantial duties of his own occupation. *See* Administrative R., at LIN002467 (defining "Disabled"). Lincoln reasonably determined that the Plaintiff did not meet this burden.

In its appeal decision, Lincoln "acknowledge[d] Mr. Hughes's claim of total impairment based on IBS," but ultimately concluded that "the clinical evidence does not support [that] Mr. Hughes was precluded from performing his Own Occupation throughout and beyond the Policy's elimination period."[8] Administrative R., at LIN000034–LIN000035. Lincoln acknowledged Hare's opinion that Hughes's symptoms were significantly disruptive to his daily life and ability to work. *See* Administrative R., at LIN000030. But two medical records reviews commissioned by Lincoln found no objective evidence to support the assertion that Hughes could not work with his condition. *See* Administrative R., at LIN000028; *cf. Falk v. Life Ins. Co. of N. Am./Cigna Grp. Ins.*, No. 12-cv-178-JL, 2013 WL 5348189, at \*11 (D.N.H. Sept. 23, 2013) (declining to "place too much weight upon" the treating physician's opinion when the doctor's opinion "appear[ed] to be based upon [the claimant's] own

---

[8]     As Hare noted, IBS "is an understandably challenging diagnosis when it comes to disability because the majority of the diagnosis and impact on functional status is based on primarily subjective findings." Administrative R., at LIN000081–LIN000082. Still, even with a difficult-to-diagnose condition like IBS, "it is permissible to require objective support that a claimant is unable to work as a result of [medical conditions that do not lend themselves to objective verification]." *Derosiers v. Hartford Life & Accident Co.*, 515 F.3d 87, 93 (1st Cir. 2008). Indeed, the Policy explains that "proof" includes the provision of "objective medical evidence in support of a claim for benefits." Administrative R., at LIN002469. Lincoln therefore did not act arbitrarily or capriciously in basing its decision largely on the absence of objective medical evidence.

subjective complaints"). Those two medical reviews instead determined that the only limitation objectively supported by the Plaintiff's medical records was the need to have ready access to bathroom facilities. *See* Administrative R., at LIN000028–LIN000029. And Lincoln ultimately determined, based on the vocational analysis it obtained from Hall, that this limitation—bathroom breaks as needed—"would not prevent Mr. Hughes from performing his own occupation." Administrative R., at LIN000035.

In sum, Lincoln had a reasonable basis, grounded in substantial record evidence, to conclude that Hughes had not met his burden of showing that his gastrointestinal ailments rendered him unable to perform his occupation. Hughes has failed to show that Lincoln's decision was arbitrary or capricious. I therefore uphold Lincoln's determination denying Hughes' LTD benefits and grant Lincoln's motion.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 25) and **GRANTS** the Defendant's Motion for Judgment on the Administrative Record (ECF No. 26).


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 17th day of August, 2023.